**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LONNIE D. JOHNSON | Case No.: 18-CV-1542 JLS (LL) |
| Petitioner, | |
| | **ORDER: (1) DENYING HABEAS CORPUS PETITION; AND (2) DENYING CERTIFICATE OF APPEALABILITY** |
| v. | |
| RALPH DIAZ, Secretary, | |
| Respondent. | |

## I.    INTRODUCTION

Petitioner Lonnie D. Johnson, a state prisoner proceeding with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition" or "Pet."), challenges his convictions for various sex crimes committed against his daughter and his fiancee's daughter. The Court has read and considered the Petition ("Pet.," ECF No. 1), the Answer and Memorandum of Points and Authorities in Support of the Answer ("Answer," ECF Nos. 8, 8-1), the Traverse ("Traverse," ECF No. 18), the lodgments and other documents filed in this case, and the legal arguments presented by both parties.[1] For the reasons discussed below, the Court **DENIES** the Petition.

---

[1] Page numbers for docketed materials cited in this Order refer to those imprinted by the court's electronic case filing system.

## II.   FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1); *see also Parle v. Fraley*, 506 U.S. 20, 35–36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness).   The state appellate recounted the facts as follows:

A. The Relationships

Tanisha is Johnson's daughter and was born in 1993.  She lived with Johnson and her mother until age five, and then lived with her grandmother or in group homes for a number of years.  At age 11, Tanisha began living with Johnson and Johnson's girlfriend (Valerie).  They lived with Betty (Valerie's child from a prior relationship) and three other of Valerie's children.

B. Evidence Concerning Molestations of Tanisha

*Tanisha's Pretrial Statements*

In December 2010, when Tanisha was 17 years old, she wrote a note to a friend in class that stated Johnson had molested her and, at her friend's urging, Tanisha gave the note to a teacher at her school.  The teacher took Tanisha to a school administrator, who notified San Diego County Health and Human Services Agency (Agency).   The administrator also contacted Tanisha's mother and told her to call the police.

Deputy Sherriff Montan went to Tanisha's school that day and interviewed her.  Tanisha told Montan she went to live with Johnson after her mother became homeless.  When she was 11, Johnson gave her a little white pill that made her feel weak and dazed but he told her she could trust him and he would never do anything to hurt her.  He then removed her clothing and sodomized her, and then directed her to bathe to wash away the evidence.  He then told her they were "going to get real close now.  You can't tell anyone."  Tanisha told Montan that Johnson continued to sodomize her every other week for the next three years and, around age 14, he began having vaginal intercourse with her or had her perform oral sex on him. Johnson would give her alcohol or marijuana beforehand, and would use a condom during vaginal sex and would flush it down the toilet.  He ejaculated once in her mouth but because she

didn't like that he did not do it again. Johnson also beat her with a miniature baseball bat that left permanent bruises on her buttocks.

Montan brought Tanisha to the Santee Police Department, where she was interviewed by Detectives Perez and Lopez.  She related the above facts to them and also told them Johnson sometimes made her bathe in bleach after the molestations. Tanisha told Perez that Johnson hit her with closed fists and left bruises when she was slow to comply with his directives, or when she got bad grades, but she explained the bruises to others as the result of accidents. She had seen Johnson strike other women, and he threatened to kill her mother if Tanisha revealed the sexual abuse.  She told the detectives she moved back in with her mother the preceding Saturday, after Tanisha revealed Johnson's current live-in girlfriend (Andrea) that Johnson had raped her. Andrea immediately had Tanisha pack her bags and then drove Tanisha to her mother's house.  While she was packing, Johnson came in and asked why she was leaving, and she told him it was because of what he did to her.  He told her she was the cause of it because her pheromones were so strong but also said he loved her and asked for forgiveness.

The detectives asked Tanisha if she was aware of any other people Johnson had molested.  She told them Johnson had molested Betty, and that Tanisha had learned of that molestation because Betty told her mom (Valerie) about the molest.  When Valerie subsequently asked Tanisha if she knew about the molest, Tanisha for the first time learned about Johnson's molestation of Betty.  However, Valerie ultimately believed Johnson's denials rather than Betty's claims.

Ms. Glass, an Agency worker, interviewed Tanisha five days later. Tanisha again repeated her allegations of molestation.  Following the interview, the Agency worker did not allow her to return to Johnson's home. However, Glass also interviewed the other children, including Betty, who did not reveal any molestations by Johnson.  Although Glass advised Valerie not to permit Johnson to have unsupervised visits with his daughters, Glass ultimately concluded her investigation without involving the dependency court and without placing any legal restrictions on Johnson's visitation.  [FN 3 omitted.]

Tanisha agreed to help police by engaging in several pretext calls with Johnson over a several-month period.  However, the calls yielded "[n]o results."

///

3

*Tanisha's Trial Testimony*

Although Tanisha testified against Johnson at the preliminary hearing and reiterated the allegations of molestation as she had described them to the police, her trial testimony changed and she recanted the allegations of wrongdoing by Johnson. [FN 4 omitted.] At trial, she testified that she first began to recant her claims in May or June of 2012 when she spoke to Johnson's cousin and her sister and at that time told them everything she had claimed about Johnson's misconduct was a lie. [FN 5 omitted.] At trial, she claimed she had lied when she told police and the Agency worker that Johnson had committed sexual misconduct against her or had given her drugs or alcohol. She testified she lied about Johnson's misconduct because she was young, angry, and wanted her mother's acceptance. She also claimed she was angry because she had developed an intimate relationship with Betty and, when Johnson learned about it, he prohibited them from seeing each other, so they concocted a plan starting when Tanisha was about 13 years old to get rid of Johnson so she and Betty could continue their relationship.

C. <u>Evidence Concerning Molestations of Betty</u>

Betty was first molested by Johnson in September 2007 when she was 13 years old. At that time, Johnson and Tanisha were living in an apartment with Betty, Betty's mother (Valerie), and Betty's sister (Diamond), but Valerie was then in the hospital giving birth to a child. Johnson asked Betty to give him a massage but, when she finished, he blocked the door. Betty tried to take cover in the bathroom, but when she left the bathroom Johnson grabbed her and rubbed against her. Betty claimed she told Tanisha about the incident but did not tell Valerie. [FN 6 omitted.]

Later that year, Johnson and Tanisha moved into a different apartment, and Betty and her sisters would visit on weekends. Betty swam in the pool and showered at Johnson's apartment, and Johnson occasionally entered the bathroom while she was showering. When Betty was about 14 years old, Johnson joined her in the shower and touched her breasts. About a month later, he carried her from the shower, put her on the bed, and orally copulated her. She was conflicted about how to feel about this, but when he kept trying to digitally penetrate her, Betty kicked him off of her and he eventually let her go. Betty testified she again told Tanisha about this incident but did not tell Valerie.

///

4

On another occasion, Betty and Tanisha were with Johnson on a bed watching a movie and smoking marijuana when Johnson began rubbing Betty's thigh. Betty told Tanisha to "get your dad" and said "[h]e's touching me," but Johnson denied it. When he resumed touching her, she ran into Tanisha's room and started crying. Tanisha tried to comfort her, and Johnson told Tanisha that, if anyone asked, she should say he was sleeping.

In total, Johnson sexually touched Betty six or seven times. Betty eventually told Valerie about the touchings. Valerie confronted Johnson but he denied it. Valerie apparently did not believe Betty.

Betty admitted she resented Johnson's relationship with Valerie and feared Johnson because she had seen him physically abuse Valerie and Tanisha. She also resented Johnson telling Valerie about Betty's misbehavior because he was not her father and should have stayed out of her business. Betty said she and Tanisha were like sisters, and had been sexually intimate for some time, but that Johnson had known about their intimate relationship and had done nothing to stop it. Betty told the detective she planned to be the one who killed Johnson and had once tried to poison his food.

D. Expert Testimony

An expert on child abuse testified about a number of subjects, including why children do not promptly report the abuse, why children provide incrementally more details once they have made an initial disclosure of the abuse, and recantation. It is uncommon in child abuse cases to have a child recant their allegations, but the likelihood of recantation is directly related to the closeness of the relationship between child and abuser. The likelihood of recantation also can be affected by the presence or lack of maternal support for the child and, where a mother is not supportive of the child after disclosures of abuse by the father, stepfather or boyfriend, the situation is "really ripe for a recantation." The expert estimated the percentage of false reports of abuse to be between 2 percent and 8 percent.

E. Defense

Johnson testified on his own behalf and denied ever molesting either Betty or Tanisha. He did discipline Tanisha (by grounding her and confiscating her cell phone and rollerblades) when she brought home bad grades in high school. When he discovered she and Betty engaged in sex when Tanisha was 14 years old, he similarly disciplined her and barred them from seeing each

other for several months.  Johnson had a strained relationship with Betty because Betty resented him dating her mother and also resented Johnson's good relationship with Betty's sister.  The defense also recalled Tanisha, who reiterated that she had lied about the molestations.  Tanisha also testified she had convinced Betty, who hated Johnson but had never told Tanisha anything about Johnson molesting her, to lie about Johnson molesting them.

The defense called members of Johnson's family, his fiancée, and a close friend of his, to testify on his behalf.  They testified Johnson was a good father who would discipline Tanisha when she misbehaved, that he was not physically abusive toward Tanisha, and he was not the type of person who would molest children.  They also testified Tanisha was a liar. Johnson's son, who dated Betty, ended his relationship with her because he felt she lied to him a lot and believed she was trying to trap him with a child. Betty did not tell Johnson's son of Johnson's misbehavior until after Johnson's son had terminated his relationship with Betty.

The defense called an expert psychologist to testify that false allegations of molestation by adolescents can occur when there is a disrupted relationship or in situations in which the child is upset with the parent and is seeking revenge.  A child can recant when the initial allegations were a lie, or when there is pressure from family members.

(Lodgment No. 8, ECF No. 9-13 at 3–10.)

## III.   PROCEDURAL BACKGROUND

On January 23, 2013, the San Diego District Attorney's Office filed a 13-count amended information charging Lonnie Daunte Johnson with three counts of lewd act on a child under 14 years-of-age, a violation of California Penal Code § 288(a) (counts one, two and ten), two counts of sodomy of a person under 14 years-of-age, a violation of California Penal Code § 286(c)(1) (counts three and twelve), one count of sodomy of an intoxicated person, a violation of California Penal Code § 286(i) (count four), one count of continuous sexual abuse of a child, a violation of California Penal Code § 288.5(a) (count five), three counts of oral copulation of a person under 16 years-of-age by a person over 21 years-of-age, a violation of California Penal Code § 288a(b)(2) (counts six through eight), one count of forcible lewd act on a child, a violation of California Penal Code § 288(b)(1) (count nine), one count of oral copulation of a person under 18 years-of-age, a violation of

18-CV-1542 JLS (LL)

California Penal Code § 288(c)(1) (count eleven), one count of lewd act on a child 14 or 15 years-of-age, a violation of California Penal Code § 288(c)(1), and one count of attempted forcible rape, a violation of California Penal Code §§ 261(a)(2) and 664 (count thirteen). (Lodgment No. 21 vol. 1, ECF No. 9-28 at 198–202.)  As to counts one, two and ten, the information also alleged Johnson had substantial sexual conduct with one of the victims and that Johnson had committed an offense described in California Penal Code § 667.61(b)(c)(e) against more than one victim.  (*Id.*)

Following a jury trial, Johnson was convicted of counts one through nine and eleven through thirteen.[2] (Lodgment No. 21 vol. 2, ECF No. 9-29 at 234–45.)  The jury also found the allegations attached to counts one and two to be true.  (*Id.*)  Following the guilty verdicts, the trial court heard and denied a motion for a new trial based on a juror's failure to disclose she had been the victim of sexual assault during voir dire and juror misconduct. (Lodgment No. 1 vol. 5, ECF No. 9-5 at 127–53.)  Johnson was sentenced to thirty years-to-life plus eight years.  (Lodgment No. 1 vol. 6, ECF No. 9-6 at 16.)

Johnson appealed his conviction to the California Court of Appeal for the Fourth Appellate District.  (Lodgment Nos. 2-4, ECF Nos. 9-7–9-10.)  While the appeal was pending, Johnson filed a habeas corpus petition in the state appellate court as well, and Respondent filed an informal response to the petition.  (Lodgment Nos. 5–6, ECF Nos. 9-10–9-11.)  The appellate court then issued an Order to Show Cause requiring Respondent to file a Return to the petition in San Diego Superior Court.  (Lodgment No. 7.)  After the Return was filed by Respondent and a Denial was filed by Johnson, the appellate court granted an evidentiary hearing which was held in San Diego Superior Court; the superior court denied the petition.  (Lodgment Nos. 11–14, ECF Nos. 9-16–9-19.)

Following the denial of Johnson's habeas corpus petition, the California Court of Appeal affirmed Johnson's conviction on direct appeal in a written opinion.  (Lodgment

---

[2]  The jury was instructed to return a verdict on *either* count nine or ten because count ten was a lesser included offense to count nine.  (Lodgment No. 21 vol. 2, ECF No. 9-29 at 101–03.)

No. 8, ECF No. 9-13.)  Johnson then filed a petition for review in the California Supreme Court on direct review.  (Lodgment No. 9, ECF No. 9-14.)  While that petition for review was pending, he filed an amended habeas corpus petition in the state appellate court.  (Lodgment Nos. 15–16, ECF Nos. 9-20–9-21.)  The state appellate court denied the amended habeas corpus petition in a written opinion.  (Lodgment No. 17, ECF No. 9-22.)  Johnson filed a petition for review in the California Supreme Court seeking review of the state appellate court's denial of his amended habeas corpus petition.  (Lodgment No. 18, ECF No. 9-23.)  The California Supreme Court denied that petition for review.  (Lodgment No. 19, ECF No. 9-24.)  The California Supreme Court then denied Johnson's petition for review on direct appeal.  (Lodgment No. 10, ECF No. 9-15.)

Johnson filed a Petition for Writ of Habeas Corpus in this Court on July 9, 2018.  (ECF No. 1.)  Respondent filed an Answer and Memorandum of Points and Authorities in Support of Answer on October 18, 2018.  (ECF Nos. 8, 8-1.)  Johnson filed a Traverse on December 18, 2018.  (ECF No. 18.)

## IV.   DISCUSSION

Johnson's Petition contains four claims.  Claims one and two concern a juror who did not disclose during voir dire that she was a victim of sexual assault.  (Pet. at 6–7, 26–52.)  Johnson contends this violated his federal due process rights to a fair trial because the juror's failure to disclose her sexual assault denied him an impartial jury and the juror committed misconduct by introducing her experience with sexual assault into deliberations.  (*Id.*)  He also contends that the voir dire that was conducted was inadequate, rendering his trial fundamentally unfair.  (*Id.*)  In claim three, Johnson argues his trial counsel was ineffective because she did not object to the trial judge's failure to ask more specific questions of jurors and because she did not conduct a sufficiently in-depth voir dire of potential jurors, both of which resulted in the juror who had suffered a sexual assault being empaneled.  (*Id.* at 8, 53–58.)  In claim four, Johnson contends the cumulative effect of the errors deprived him of a fair trial.  (*Id.* at 9, 68–69.)  Respondent argues that the state

///

court's resolution of the claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Answer, ECF No. 8-1 at 5–31.)

### A.    Standard of Review

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).  Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  28 U.S.C. § 2254(d)(1)–(2); *Early v. Packer*, 537 U.S. 3, 8 (2002).  In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable.  *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts.  *See Bell v. Cone*, 535 U.S. 685, 694 (2002).  The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case.  *Id*.  Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable."  *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  The Court may also grant relief if the state court's decision was based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).

///

1   Where there is no reasoned decision from the state's highest court, the Court "looks
2   through" to the last reasoned state court decision and presumes it provides the basis for the
3   higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805–06
4   (1991). If the dispositive state court order does not "furnish a basis for its reasoning,"
5   federal habeas courts must conduct an independent review of the record to determine
6   whether the state court's decision is contrary to, or an unreasonable application of, clearly
7   established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000),
8   *overruled on other grounds by Andrade*, 538 U.S. at 75–76; *accord Himes v. Thompson*,
9   336 F.3d 848, 853 (9th Cir. 2003). Clearly established federal law, for purposes of
10  § 2254(d), means "the governing principle or principles set forth by the Supreme Court at
11  the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

### B.    Ground One: Juror Misconduct During Voir Dire and Deliberations

13  Johnson alleges that his federal due process right to a fair trial were violated when a
14  juror failed to disclose during voir dire that she had been raped. (Pet. at 6, 26–52.) Johnson
15  also contends the juror committed misconduct during deliberations when she introduced
16  her experience of being raped into deliberations. (*Id.*) Respondent argues the state court's
17  resolution of these claims was neither contrary to, nor an unreasonable application of,
18  clearly established Supreme Court law. (Answer at 11–23.)

19  Johnson raised these claims in the petition for review he filed in the California
20  Supreme Court on direct appeal and in the petition for review following the denial of the
21  amended petition for habeas corpus he filed in the California Supreme Court. (Lodgment
22  Nos. 9, 18, ECF Nos. 9-14, 9-23). The California Supreme Court summarily denied those
23  petitions. (Lodgment Nos. 15, 194, ECF Nos. 9-20, 9-24.) Accordingly, this Court must
24  "look through to the last reasoned state court decision addressing the merits of the claims."
25  *Ylst*, 501 U.S. at 805–06. The state appellate court's opinion on direct review is the last
26  reasoned state court decision because the state appellate court concluded the voir dire and
27  ///
28  ///

10

juror misconduct claims were procedurally defaulted as they had been raised and rejected on appeal.[3]  (Lodgment No. 17, ECF No. 9-22 at 3.)

### 1.    Voir Dire

Johnson claimed in state court, as he does in his federal habeas corpus petition, that juror no. 2 concealed relevant information during voir dire which resulted in a jury that was not fair and impartial, violating his federal due process rights.  (Pet. at 27–38.)  The state appellate court analyzed Johnson's voir dire claim as follows:

> We agree with the People that Johnson has not satisfied his initial burden of showing Juror 2 committed misconduct by affirmatively "fail[ing] to answer honestly a material question on voir dire . . . ."  ([*McDonough Power Equipment, Inc. v. Greenwood* (1984) 464 U.S. 548, 556].)  The court did ask the jurors to raise their hands if they believed that "no matter how hard you tried, you could not . . . act fairly and impartially as a trial juror," and then "refine[d] it a bit" by asking which of the jurors who had raised his or her hand "did so in large part because your own life or the lives of someone near and dear to you within your family or close circle of friends have been very directly impacted by the subject of child molestation."  However, Johnson produced no evidence showing Juror 2's failure to disclose that she had been raped represented an intentional concealment of material facts, because there was no evidence her rape experience arose because she was molested as a child.  Although Juror 2 was present at the evidentiary hearing in connection with his new trial motion, Johnson elected not to call her to testify about the details of her rape experience, leaving it to pure speculation whether it was a sexual assault when she was an adult, and whether the attacker was a spouse, or a date, or a stranger.  More importantly, Johnson's failure to call Juror 2 as a witness at the new trial motion hearing leaves to pure speculation as to whether she understood the voir dire questions to exclude the need to reveal sexual assaults except those involving minors, making her failure to disclose an honest and good faith omission not constituting misconduct (*see, e.g.*, *People v. Majors* (1998) 18 Cal.4th 385, 419–420 [no misconduct because court "cannot fault [juror's] decision to respond to the question as phrased"]), or whether she understood the voir dire questions to call for the revelation of any sexual assault, which she chose intentionally to conceal, constituting misconduct.  Because it is Johnson's burden to prove misconduct occurred ([*In re Carpenter* (1995) 9 Cal.4th 634, 657]) and a court will not presume

---

[3] The superior court judge denied the motion for a new trial from the bench with no written opinion. (Lodgment No. 16, ECF No. 9-21 at 234–40.)

18-CV-1542 JLS (LL)

greater misconduct than the evidence shows ([*People v. Lewis* (2001) 26 Cal.4th 334, 390]), Johnson's evidentiary showing below was inadequate to show misconduct.

Johnson has not shown Juror 2's affirmative statement to the critical question—that she could act fairly and impartially—was false. The mere fact a prospective juror had been sexually assaulted does not categorically preclude that juror from honestly representing that he or she could nevertheless act fairly and impartially, and Johnson has not cited any persuasive law suggesting such a prior experience would constitute grounds for excusing that juror for cause under the relevant provisions of Code of Civil Procedure section 229.  [FN 9 omitted].

Johnson appears to assert that, under [*People v. Diaz* (1984) 152 Cal.App.3d 926], even when a juror honestly believes he or she can be fair and impartial and therefore conceals relevant information, a new trial motion must be granted.  In *Diaz*, the defendant was charged with assault with a deadly weapon, the jurors were asked on voir dire whether they had been a victim of a similar crime, and the juror in question remained silent.  However, in the middle of trial, the juror told court personnel she had been the victim of an attempted rape, during which the assailant gashed her chin with a knife, after which she "hunted down" the assailant and stabbed him.  (*Diaz*, *supra*, 152 Cal.App.3d at pp. 929–931.)  When the court asked the juror why she had not disclosed this information, the juror stated that it had not occurred to her that the assault on her was similar to assault with a deadly weapon, and assured the court that her experience would not bias her in deciding the case.  (*Id.* at p. 931.)  After the jury convicted the defendant, the *Diaz* court concluded the trial court had erred in refusing to dismiss the juror and declare a mistrial.  The *Diaz* court, after concluding the appropriate standard of review was independent review (*id.* at pp. 933–934), held that retention of the juror was reversible error, reasoning that the "*[c]oncealment* under the instant circumstances, *regardless whether intentional*, constitutes misconduct" (*id.* at p. 936, italics added) and "the presumption of prejudice has not been rebutted by the People by evidence showing the nonexistence of prejudice, or by an examination of the entire record" (*ibid.*), particularly where the jury had elected her as "foreperson . . . , thus highlighting the reasonable probability the remaining jurors would be substantially influenced by her views."  (*Ibid.*)

Although *Diaz* stated that its approach applied to any concealment, regardless of whether the concealment was "intentional" (*Diaz*, *supra*, 152 Cal.App.3d at p. 936), *Diaz*'s *raison d'être* was that the juror had been affirmatively asked

18-CV-1542 JLS (LL)

a question directly calling for her to reveal whether she had been the victim of a knife attack, and she (1) concealed her prior victimization of an attempted rape by a knife-wielding assailant, and (2) her comments led the bailiff and court clerk to concur that the juror was "'prejudiced as to violent crimes, especially that of women.  She is obsessed with rape, with victims, and the men who perpetrate this act [and we] cannot honestly say that she would be an impartial juror as to violent crime.'"  (*Id*. at p. 931.)  Neither of those factors is present here, and *Diaz* is distinguishable as to the core facts on which the decision turned.

Moreover, *Diaz*'s approach does not appear to have gained any traction, and the courts in both *People v. Kelly* (1986) 185 Cal.App.3d 118 and *People v. Jackson* (1985) 168 Cal.App. 3d 700 (*Jackson*) rejected *Diaz*'s approach where the nondisclosure was unintentional and there was no evidence of actual bias.  (*See Kelly*, at pp. 125–129 [rejecting *Diaz* and concluding the trial court did not abuse its discretion by denying new trial motion where incident was dissimilar, nondisclosure was not intentional].)  The *Jackson* court, rejecting *Diaz*'s approach, explained:

> "It is clear that where a juror *intentionally* lies on voir dire, such an act constitutes misconduct.  [Citation.]  Similarly, it is misconduct for a juror to read newspaper accounts of the trial [citation], contact an outside attorney for advice during deliberations [citation] or question the police for information about the case [citation].  But to find misconduct where 'concealment' is *unintentional* and the result of misunderstanding or forgetfulness is clearly excessive.  It is with good reason that the law places severe limitations on the ability to impeach a jury's verdict.  To hold otherwise would be to declare 'open season' on jury verdicts not to a party's liking.  A green light would be given for every unsuccessful litigant to root out after-the-fact evidence of any 'subconscious bias.'"  (*Jackson*, *supra*, 168 Cal.App.3d at pp. 704–705, italics added.)

*Jackson* concluded the proper test for unintentional nondisclosure is "whether the juror is sufficiently biased to constitute good cause for the court to find . . . he is unable to perform his duty," and applied the deferential abuse of discretion standard to the trial court's assessment of that issue.  (*Jackson*, *supra*, 168 Cal.App.3d at p. 706.)  Although our Supreme Court in [*People v. San Nicholas* (2004) 34 Cal.4th 614] did not explicitly overrule *Diaz*, it did expressly adopt *Jackson*'s approach as to unintentional nondisclosures.  (*San*

18-CV-1542 JLS (LL)

*Nicolas*, at p. 644.)  We conclude that, because *Diaz* apparently has not been followed by other cases and our Supreme Court has approved the contrary approach used in a case rejecting *Diaz*, the proper approach is to evaluate "[w]hether a failure to disclose is intentional or unintentional and whether a juror is biased," and these issues "are matters within the discretion of the trial court," whose decision will not be disturbed on appeal "[e]xcept where bias is clearly apparent from the record . . . ." (*San Nicolas*, *supra*, 34 Cal.4th at p. 644.)

Johnson finally appears to argue that, even assuming the nondisclosure was inadvertent, he was nevertheless entitled to a new trial because Juror 2's actual "bias is clearly apparent from the record" (*San Nicolas*, *supra*, 34 Cal.4th at p. 644) because (1) she did not reveal her prior experience during voir dire [FN 10]; (2) she revealed it to fellow jurors during deliberations to explain how she analyzed the evidence and to influence how the jury should analyze the evidence; and (3) the revelation was accompanied by great emotion. However, none of these facts, either individually or collectively, convince us Juror 2's actual bias is "clearly apparent" from the record.  For example, the record showed Juror 2 actively participated in the voir dire process, and even volunteered information (e.g. that the trial judge had presided over a trial involving her father) only tangentially relevant, which supports an inference she was not subjectively attempting to hide information in order to be seated as a juror.  Moreover, the fact Juror 2 revealed her life experience to explain her view of the evidence was not evidence of actual bias.  [FN 11.]  (*People v. Steele* (2002) 27 Cal.4th 1230, 1266 ["using one's background in analyzing the evidence . . . is appropriate, even inevitable"].)  Finally, the fact Juror 2 was "emotional" does not show a bias that is clearly apparent because, as the trial court noted, little weight could be attributed to the fact Juror 2 became emotional during the deliberations because "deliberations often . . . become somewhat emotional and heated."

…

> [FN 10:] Johnson suggests that, had she revealed the information, the court would have dismissed Juror 2 for cause or, at a minimum, counsel could have used a peremptory challenge to eliminate a potentially biased juror.  However, in cases not involving intentional concealment by a juror, the fact the juror acted in "good faith when answering voir dire questions is the most significant indicator that there was no bias' [citation] and 'an honest mistake on voir dire cannot disturb a judgment in the absence of proof that the juror's wrong or incomplete answer hid

14

the juror's actual bias' [citation]."  (*In re Boyette* (2013) 56 Cal.4th 866, 890.)  Although the inadequate information may have impacted the use of a peremptory challenge, "the test asks not whether the juror would have been stricken by one of the parties, but whether the juror's concealment (or nondisclosure) evidences bias."  (*Ibid*.)

[FN 11:] Indeed, defense counsel's voir dire questions to this juror showed the defense actively sought jurors who would employ their life experience.  The defense sought to assert that Tanisha lied about the molestations to police and defense counsel's voir dire asked (among other things) whether jurors had experience with teenagers not telling the truth and, when defense counsel noted Juror 2 had nodded in agreement, she asked Juror 2 about that.  Juror 2 told counsel about working with 800 teenagers, and that the Juror's 17 year old lies "every time her mouth moves."

(Lodgment No. 8, ECF No. 9-13 at 21–27.)

"The Sixth Amendment guarantees a criminal defendant a fair trial.  One touchstone of a fair trial is an impartial trier of fact—a jury capable and willing to decide the case solely on the evidence before it."  *Fields v. Brown*, 503 F.3d 755, 766 (9th Cir. 2007) (quoting *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)) (internal quotation marks and citations omitted).  As the Supreme Court recognized in *McDonough*, "[v]oir dire examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors."  *McDonough*, 464 U.S. at 554.  Juror bias can be show in two ways: actual bias, which can occur when a juror intentionally does not answer voir dire questions truthfully and a truthful answer would have led to a successful challenge for cause or when a juror exhibits a "predisposition to not to decide an issue impartially," or implied bias, in which bias can be presumed based on the circumstances.  *Estrada v. Scribner*, 512 F.3d 1227, 1240 (9th Cir. 2008); *Fields*, 503 F.3d at 766.  "Whether a juror is dishonest [or actually biased] is a question of fact . . . ."  *Fields*, 503 F.3d at 767.

///

A defendant's right to a fair trial is violated when a juror fails to honestly answer a question during voir dire and a correct response would have led to a successful challenge of that juror for cause.  *McDonough*, 464 U.S. at 556.  During voir dire, the trial judge asked the prospective jurors whether they could be fair and impartial, particularly given the subject matter of the case:

> [THE COURT]:  So simply because you would prefer not to deal with such subject matter, simply because you might, if given your druthers, prefer some other type of case to sit upon as a jury, and sorry, you don't get your druthers, and neither do I for that matter, but very seriously, I want you to understand and appreciate that this case has to be decided based upon the evidence that's presented within the walls of this courtroom.  And it needs to be decided upon a very objective and critical analysis of the evidence, using logic and reason and setting aside, to the extent that you can, the emotional impact of such subject matter.
>
> So with all of that said, having in mind the type of case that this is, and moreover the nature of the charges and general subject matter of this trial as I have outlined it and discussed those matters with you, how many of you believe that no matter how hard you tried, you could not, if selected as a juror here, act fairly and impartially as a trial juror as to either the defendant Mr. Johnson, or the People, as represented by the prosecutor?
>
> If your answer is truly yes to that question, that you could not, for whatever reason, please, beginning with those of you in the jury box on my left, now raise your hand.

(Lodgment No. 20 vol. 1, ECF No. 9-25 at 15–16.)

After several jurors raised their hands, the judge asked a follow-up question regarding their personal experience with the subject matter of the case:

> [THE COURT]:  How many of you who raised your hand to that question did so in large part because your own life or the lives of someone near and dear to you within your family or close circle of friends have been very directly impacted by the subject matter of child molestation, in whatever form it may have taken?

///
///

So if those of you who raised your hand to the previous question did so because of a personal impact upon you or someone near and dear to you, I'd like you to again raise your hand.

(*Id.* at 17.)

Juror No. 2 did not raise her hand in response to either of the court's questions and was kept in the jury pool. (*Id.* at 18.) After a lunch break, voir dire continued with general questions such as whether the prospective jurors could follow the law and whether any prospective jurors knew members of the defense, prosecution, or court staff. (Lodgment No. 20 vol. 3, ECF No. 9-27 at 3–39.) As part of this questioning, the trial judge again emphasized that jurors had to be free of bias in order to sit on the jury.

[THE COURT]: And put another way, what we're looking for as ideal jurors are individuals who can comfortably and honestly say if I were sitting next to the prosecutor as her client, I'd want someone like me sitting on the jury. And similarly, if you can imagine yourself sitting where Mr. Johnson is, accused of these serious crimes, if you can honestly say I would be comfortable were I him in having me as a juror with my life experiences and assurance that I'll accord him the presumption of innocence, unless and until I'm persuaded by the evidence otherwise beyond a reasonable doubt, then you're one of the perfect or ideal jurors that we're looking for.

In other words, if you can comfortably say no matter which counsel table I might find myself at, I would be equally comfortable having 12 men and women of like mind and life experience to my own sitting in judgment, then you're very much a preferred candidate, so to speak, as a juror for this case.

With that in mind, is there anyone who for any reason decidedly could not say that? Doing a little soul searching once again, anyone who honestly has to say, hey, Ms. Reid wouldn't want 12 of me on the jury, or conversely, if Ms. Kovtun would say, hey, you wouldn't want 12 of me on this jury, then we would need to know that and ask you to share that with us at this time.

Anyone who, put another way, has kind of an agenda or an opinion already drawn about this case that would somehow render you other than a fair, open-minded and impartial juror for this case, given what you've heard about it? Anyone just raise your hands if so.

(*Id.* at 10–11.)

Juror No. 2 did not raise her hand in response to this questioning.  She later told the judge she could be fair and impartial.  (*Id.* at 22–23.)  When later in the voir dire process defense counsel asked if anyone had experience with teenagers not telling the truth, Juror No. 2 said she had worked in the past as a security guard at a high school and had a 17 year old step-daughter "and every time her [step-daughter's] mouth moves, she lies."  (*Id.* at 33.)

After the jury convicted Johnson, Juror No. 10 approached Johnson's attorney and asked her why a person who had been raped had been permitted to sit on the jury. (Lodgment No. 16, ECF No. 9-21 at 244.)  Johnson's attorney filed a motion for a new trial based on Juror No. 10's revelation.  (Lodgment No. 20, ECF No. 9-29 at 148–54.)  At the hearing on the motion for a new trial, Juror No. 10 testified that the jury was deadlocked on the counts involving Tanisha and discussing "how somebody might feel [about being raped] or if somebody would change their story about being raped" when Juror No. 2 revealed that she had been raped and told her fellow jurors, "No, that's not the way it is, [t]hat's not what happened when I was raped," and then began crying.[4]  (Lodgment No. 1, ECF No. 9-5 at 129.)  After the revelation, the jury went home for the weekend and, when they returned on Monday, a verdict of guilty was reached on the Tanisha counts.  (*Id.*)  In denying the motion, the trial judge stated that he thought the questions asked of the jurors during voir dire should have elicited a disclosure by any prospective juror that he or she had been the victim of a sexual assault, but that he could not determine whether Juror No. 2's failure to disclose her sexual assault was intentional or unintentional.  (*Id.* at 149–50.) Accordingly, the judge denied the motion because Johnson had not made a sufficient showing of prejudicial misconduct.  (*Id.* at 151.)

///

---

[4] Juror No. 2 was present at the hearing on the motion for a new trial but was not called to testify by either side.  (Lodgment No. 1 vol. 5, ECF No. 9-5 at 127–51.)  Juror No. 2 did testify at the subsequent evidentiary hearing on Johnson's state habeas corpus petition.  (Lodgment No. 16, ECF No. 9-21 at 66–240.)

18-CV-1542 JLS (LL)

The record supports the state appellate court's denial of Johnson's claim. The trial judge asked prospective jurors if any of them felt they could not be fair and impartial. (Lodgment No. 20, ECF No. 9-25 at 17.) Juror No. 2 did not answer in the affirmative because she believed she could be fair and impartial. (*Id.* at 14.) The judge then directed his next question to those jurors who had raised their hand indicating they could not be fair and impartial, asking them whether it was because of their experience with "child molestation in whatever form it may have taken." (*Id.* at 17.) Juror No. 2 was not in the group of prospective jurors who had raised their hand in response to the question about impartiality and so did not respond and the trial judge did not ask jurors whether they had had an experience with sexual assault in general. Juror No. 2's failure to respond in the affirmative to either of these questions was understandable given she believed she could be impartial and she had not been a victim of child molestation.

At the evidentiary hearing on the habeas corpus petition filed in the state appellate court, Juror No. 2 testified that had she been asked if she had been a victim of sexual assault, she would have disclosed it. (Lodgment No. 16, ECF No. 9-21 at 135.) She also testified she understood the focus of the trial judge's questions to be whether prospective jurors could be fair and impartial; because she believed she could be, she did not think she needed to reveal she had been raped. (*Id.* at 133–34.) In addition, she testified she thought the judge was asking prospective jurors to consider what experiences they may have had with child molestation, not sexual assault in general, when he asked them to consider whether they could be fair and impartial. (*Id.* at 132.) At the conclusion of the hearing, the judge presiding over the evidentiary hearing concluded that Juror No. 2 was credible when she testified she believed she could be fair and impartial and did not intentionally hide the fact that she had been sexually assaulted. He noted that the court first asked jurors to "consider the court's questions and counsel's questions regarding this subject matter, and do some soul searching regarding this subject matter" and whether they could be fair and impartial. (*Id.* at 235.) In response, twenty-eight jurors indicated they could not be fair and impartial, and of those, twenty-one told the judge it was because they had had

experience with child molestation; only one told the judge it was because they had experience with rape.  (*Id.*)  Thus, the majority of other jurors also interpreted the trial judge's questioning as relating only to child molestation, with which Juror No. 2 had no experience.  The judge concluded:

> With the nature of the description of the subject matter and the number of responses to the subject matter – child molestation; child molestation – its hard for me to conclude that . . . Juror No. 2, truly was hiding something. She's testified that I was aware of my responsibility to describe a bias I might have, and I – if I had a bias, I would have revealed it.

(*Id.*)

Given the above, the state court's conclusion that Juror No. 2's failure to disclose her experience as a rape victim was an honest mistake and that she was not actually biased was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Bell*, 535 U.S. at 694.  Nor was it based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).

The Supreme Court has not explicitly acknowledged or rejected the theory of implied juror bias, but in *Estrada* the Ninth Circuit stated that in "extraordinary cases, courts may presume bias based on the circumstances," *Estrada*, 512 F.3d at 1240 (quoting *Dyer v. Calderon*, 151 F.3d 970, 981 (9th Cir. 1998)), and gave four situations where bias might be implied:

> (1) where the juror is apprised of such prejudicial information about the defendant that the court deems it highly unlikely that he can exercise independent judgment even if the juror states he will, (2) the existence of certain relationships between the juror and the defendant, (3) where a juror or his close relatives have been personally involved in a situation involving a similar fact pattern, and (4) where it is revealed that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or that the juror was a witness or somehow involved in the underlying transaction.

*Id.* (quoting *Coughlin v. Tailhook Ass'n*, 112 F.3d 1052, 1062 (9th Cir. 1997)).

None of the scenarios envisioned in *Estrada* are present in Johnson's case. Moreover, with regard to juror bias, the Supreme Court "has long held that the remedy for

18-CV-1542 JLS (LL)

allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982).  Johnson was afforded this opportunity both at the hearing on the motion for a new trial and at the evidentiary hearing for the habeas corpus petition he filed in the state appellate court.  The judges who presided over both of those hearings concluded that Juror No. 2 was not biased.  For the foregoing reasons, the state court's denial of this claim is neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Bell*, 535 U.S. at 694.  Nor was it based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).  Johnson is therefore not entitled to relief as to this claim.

### 2.    *Deliberations*

Johnson contends Juror No. 2 committed misconduct during deliberations when she told her fellow jurors she had been raped, thereby introducing her own experiences into deliberations.  (Pet. at 6, 38–47.)  Respondent argues Johnson is not entitled to relief as to this claim because the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Answer at 22–23.)

The California Supreme Court summarily denied Johnson's petition for review on direct appeal and the petition for review challenging the state appellate court's denial of his habeas corpus petition.  (Lodgment Nos. 10, 19, ECF Nos. 9-15, 9-19.)  The state appellate court opinion denying this claim on habeas corpus review did not address the merits of the claim.  (Lodgment No. 17, ECF No. 9-22.)  Therefore, this Court must "look through" to the last reasoned state court decision that addresses the merits of the claim, which is the state appellate court's opinion denying the claim on direct review.  That court wrote:

> Even assuming the issue is preserved [FN 12 omitted], we are unconvinced on this record that the Juror 2's comments were misconduct. Here, the jury heard conflicting evidence on why, and under what circumstances, a child molestation victim might recant her statements to police alleging a molestation, and the voir dire showed the potential for children to make false accusations of molestations and for recanting were matters of which potential jurors were already aware.  We are aware of no law holding a juror commits

misconduct by drawing on his or her own life experience or on matters that are part of the public consciousness when evaluating evidence introduced at trial, and the law appears to be to the contrary. (*See*, *e.g.*, *People v. Manibusan* (2013) 58 Cal.4th 40, 57–58; *People v. Pride* (1992) 3 Cal.4th 195, 267–268; *People v. Yeoman* (2003) 31 Cal.4th 93, 162 [no misconduct by jurors recounting personal experiences involving drugs because effect of drugs, although a proper subject of expert testimony, has become a subject of common knowledge among laypersons].)

(Lodgment No. 8, ECF No. 9-13 at 27.)

Federal Rule of Evidence 606(b) prohibits the use of a juror's testimony regarding the jury's mental processes, statements made or incidents which occurred during deliberations, or the effect of any such statements or incidents on an individual juror's mental process. Fed. R. Evid. 606(b). Clearly established Supreme Court law states that, except for "extraneous influences," juror testimony that impeaches a verdict is "flatly prohibited." *Tanner v. United States*, 483 U.S. 107, 117 (1987); *see also Warger v. Shauers*, 574 U.S. 40, 51–52 (2014). Excluded evidence, evidence extrinsic to the trial, and other outside influences such as threats and bribes have been found to be "extraneous influences." *Mattox v. United States*, 146 U.S. 140, 148–53 (1892); *United States v. Henley*, 238 F.3d 1111, 1115–18 (9th Cir. 2001). By contrast, jurors recounting personal experiences, discussions regarding the defendant's failure to testify, the jurors' ability to see and comprehend evidence, and allegations that jurors were under the influence, incompetent, or did not follow jury instructions, are all are considered internal processes and are not to be considered by a court faced with a motion for a new trial due to juror misconduct. *Tanner*, 483 U.S. at 120–21; Fed. R. Evid. 606(b).

Here, Johnson seeks to impeach the guilty verdict in his case using testimony by Juror Nos. 2 and 10 regarding Juror No. 2's recounting of her personal experience with rape during deliberations. That is "flatly prohibited" by *Tanner*. Even if this Court were to consider the evidence showing that Juror No. 2 recounted her experience with rape during deliberations, neither California nor federal law prohibit a juror from using personal experience as part of deliberations. *Grotemeyer v. Hickman*, 393 F.3d 871, 879 (9th Cir.

2004); *People v. Leonard*, 40 Cal. 4th 1370, 1414 (2007).  The state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Bell*, 535 U.S. at 694.  It was also not based on an unreasonable determination of the facts.  28 U.S.C. § 2254 (d)(2).  Johnson is therefore not entitled to relief as to this claim.

### C.  Ground Two: Inadequate Voir Dire

Johnson alleges in ground two that the voir dire conducted in his case and the inquiry into juror misconduct were constitutionally inadequate and violated his right to a fair trial.  (Pet. at 7, 49–52, 145–49.)  Respondent contends the state court's resolution of Johnson's inadequate voir dire claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Answer at 23–26.)  Respondent also contends Johnson's claim that the inquiry into juror misconduct is unexhausted and meritless.  (*Id.*)

Johnson raised his inadequate voir dire claim in the petition for review he filed in the California Supreme Court on direct review.  (Lodgment No. 9, ECF No. 9-14.)  The state supreme court summarily denied the petition, and therefore this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its review.  *Ylst*, 501 U.S. at 805–06.  That court wrote:

> We conclude, as a whole, the questioning *was* reasonably sufficient to test the jury for *bias or partiality*, and therefore was not so inadequate that we can say the resulting trial was fundamentally unfair.  The court iterated, and reiterated, that its focus was on whether, given "the nature of the charges and general subject matter . . . , how many of you believe that no matter how hard you tried, you could not . . . act fairly and impartially as a trial juror," and although Juror 2 did not raise her hand, numerous others did.  The court then asked, in response to the numerous hands raised, whether this was "in large part" because they had been touched by the subject of child molestation, and then individually questioned those numerous jurors who raised their hands.  Although the court eventually excused most of the people who had raised their hands to the "inability to be fair" question (as refined by the "based on personal experience question), including one who had not been personally touched by molestations or sexual assaults but had personal antipathy toward alleged child molesters, the court retained three prospective jurors who stated that, notwithstanding having been personally touched by molestations or

sexual assaults, they could be fair and impartial jurors. The court then resumed questioning of the entire remaining panel and again emphasized the fundamental question was whether any prospective juror believed he or she could not objectively decide the facts based on reason and logic rather than emotion, or whether any juror (if that juror were in Johnson's shoes) would honestly have to say that Johnson would not want him or her on the jury. The court also obtained an affirmative statement from the jurors, including Juror 2, that they could be fair and impartial, and gave the jurors a final opportunity to reveal anything that might be germane to the juror's ability to serve on the jury.

Because the questions focused on the core inquiry—whether there was anything that might inhibit the prospective juror from acting fairly and impartially—the questions as asked by the court and as supplemented by the questions posed by defense counsel "provided an adequate basis upon which the parties were able to exercise challenges for cause as well as peremptory challenges. In these circumstances, the trial court had no duty to compel counsel to explore more thoroughly the views of the prospective jurors, or to engage itself in additional questioning." (*People v. Foster* (2010) 50 Cal.4th 1301, 1324–1325.) [(internal quotations and citations omitted.)]

Johnson asserts the voir dire was insufficient, and his attorney provided inadequate assistance of counsel in not curing the deficiency by either objecting to the court's voir dire or by asking further follow up questions, because the voir dire did not ask one of the questions in the form recommended by the Judicial Council in the California Standards of Judicial Administration. (Cal. Stds. Jud. Admin., § 4.30.) Standard 4.30, subdivision (b)(16), recommends the jury be asked "Have you or, to your knowledge, has any relative, close friend, or anyone with whom you have a significant personal relationship, ever been the victim of any crime?" However, Standard 4.30 makes clear that the purpose of voir dire is to ask "all questions necessary to insure the selection of a fair and impartial jury" (*id*. at subd. (a)(2)), and any voir dire that did not "use the Standards verbatim does not necessarily mean that voir dire failed to expose prospective jurors who were biased or unable to follow the law. [Citations.] Nor does any technical deviation from the Standards excuse a reviewing court from examining 'the entire voir dire' to determine whether it was sufficient to secure an impartial jury." (*People v. Contreras* (2013) 58 Cal.4th 123, 145.) We are satisfied that the voir dire as a whole was reasonably sufficient to ask whether, in light of the charges, the jurors could act fairly and impartially, and that inquiry was reasonably sufficient to test the jury for bias or partiality ([*People v. Cleveland* (2004) 32

Cal.4th 704, 737]); therefore, the absence of a specific question recommended by the Judicial Council did not render the voir dire "so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair." ([*People v. Holt* (1997) 15 Cal.4th 619, 661].)

(Lodgment No. 8, ECF No. 9-13 at 31–33.)

"No hard-and-fast formula dictates the necessary depth or breadth of voir dire." *Skilling v. United States*, 561 U.S. 358, 386 (2010) (citations omitted). "[A] suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried. That inquiry is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Conners v. United States*, 158 U.S. 408, 413 (1895).

The state court's conclusion that the voir dire conducted in Johnson's case was sufficient to guarantee him a fair trial was reasonable. The trial judge ensured Johnson's jury was impartial by telling prospective jurors that they needed to be honest with themselves about their biases, that they needed to be honest in their responses to the court's questions, that Johnson was entitled to an unbiased jury, and that the purpose of voir dire was to ensure that the jury that would ultimately hear Johnson's case would be fair and impartial. (Lodgment No. 20 vol. 1, ECF No. 9-25 at 8–9, 14–16; Lodgment No. 20 vol. 3, ECF No. 9-27 at 11–12.) He asked prospective jurors whether they thought they could not be fair and impartial and whether they had personal experience with the subject matter of the trial. (*Id.* at 16–18.) He also asked prospective jurors whether they could honestly say if they were sitting at either the prosecution or defense table, they would be comfortable with someone like them on the jury and whether any prospective juror had an agenda or opinion that would prevent them from being fair and impartial. (Lodgment No. 20 vol. 3, ECF No. 9-27 at 10–11.) As the state appellate court noted, the trial judge excused 19 of the 22 people who told the judge they thought they could not be fair and impartial and the remaining three jurors did not sit on Johnson's jury. (Lodgment No. 20 vol. 2, ECF No. 9-26; Lodgment No. 8, ECF No. 9-13 at 13.) "The Constitution . . . does not dictate a

catechism for voir dire, but only that the defendant be afforded an impartial jury." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). Given the extent of the trial judge's questioning and the ultimate composition of the jury, Johnson has not established that the voir dire in his case resulted in a jury that was not fair and impartial.

*Morgan* also resolves Johnson's contention that the voir dire conducted by the state court was insufficient because it did not use the California Judicial Council's suggested question, "Have you or, to your knowledge, has any relative, close friend, or anyone with whom you have a significant personal relationship, ever been the victim of any crime?" The trial judge was not required to use any specific question to ensure Johnson's jury was fair. Finally, Johnson's contention that the voir dire was inadequate to preserve his right to a fair trial because the trial judge did not question Juror No. 2 about the judge's involvement in a trial involving her father is meritless. Johnson claims that further questioning about the trial judge's involvement in Juror No. 2's father's case "could have uncovered potential bias . . . ." (Pet. at 51.) This is simply speculation. Claims based on speculation are not sufficient to state a federal habeas corpus claim. *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).

Johnson suggests that the state court's inquiry into juror misconduct was also insufficient. (Pet. at 7.) As Respondent notes, this claim appears to be unexhausted. (Answer at 26.) This Court may, however, deny the claim if it is plainly meritless. *Cassett v. Stewart*, 406 F.3d 614, 623–24 (9th Cir. 2005). Johnson's juror misconduct claims have been evaluated at two state court hearings, a hearing on the motion for a new trial and a hearing on Johnson's state habeas corpus petition. Juror No. 2 was questioned, both on direct and cross-examination, at a lengthy and thorough hearing on the habeas corpus petition. (Lodgment No. 16, ECF No. 9-21 at 66–240). Johnson's contention that his juror misconduct claims have not been adequately investigated is meritless.

For the foregoing reasons, the state court's denial of Johnson's inadequate voir dire claim was neither contrary to, nor an unreasonable application of, clearly established
///

Supreme Court law.  *Bell*, 535 U.S. at 694.  Nor was it based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).  Johnson is not entitled to relief.

### D.    Ground Three:  Ineffective Assistance of Counsel

Johnson argues his counsel was ineffective when she failed to adequately question prospective jurors during voir dire and when she failed to object to the trial court's inadequate voir dire.  (Pet. at 8, 53–58.)  Respondent counters that the state courts resolution of these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Answer at 26–31.)

Johnson raised these claims in the petition for review he filed in the California Supreme Court on direct appeal and in the petition for review he filed in the California Supreme Court following the denial of his habeas corpus petition by the state appellate court.  (Lodgment Nos. 9, 18, ECF Nos. 9-13, 9-23.)  The California Supreme Court summarily denied both petitions for review.  (Lodgment Nos. 10, 19, ECF Nos. 9-15, 9-24.)  Accordingly, this Court must "look through" to the last reasoned state court decision denying the claims as the basis for its review.  *Ylst*, 501 U.S. at 805–06.  The state appellate court's decision denying Johnson's state habeas corpus petition is the last reasoned state court decision.  That court wrote:

> Johnson contends that his trial counsel's "failure to object to the trial court's inadequate voir dire and subsequent failure to ask more probing questions during the attorney voir dire denied [him] his right to effective assistance of counsel, as guaranteed by the federal and state constitutions. (U.S. Const., 6th Amend.; Cal. Const., Art. I, § 15.)"  Johnson specifically faults his counsel for failing to ensure that each prospective juror was asked whether the juror had ever been the victim of a sex crime or any other crime, and contends that as a result of this failure a biased juror, whom Johnson would have challenged for cause or peremptorily, was allowed to sit on the jury.  To establish this claim, Johnson must show both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); accord, *People v. Ledesma* (1987) 43 Cal.3d 171, 216.)  More specifically, Johnson must show that counsel's alleged "omissions were outside the wide range of professionally competent assistance," and that "there is a reasonable probability that, but for

18-CV-1542 JLS (LL)

counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, at pp. 690, 694; accord, *Ledesma*, at pp. 216–218.)

Johnson has not met his burden to establish deficient performance by trial counsel. Counsel testified that she thought that during voir dire the court had asked questions sufficient to expose any bias or prejudice that the prospective jurors might have had based on their prior experiences with sex crimes. This court determined on appeal that the court's voir dire was adequate for this purpose. Counsel therefore reasonably could have concluded that the court's voir dire was adequate to expose any bias or prejudice against Johnson based on the charges, and that asking prospective jurors whether they had ever been the victim of a sex crime or any other type of crime, as counsel had initially intended to do, was not needed. (*See People v. Horton* (1995) 11 Cal.4th 1068, 1123; *People v. Freeman* (1994) 8 Cal.4th 450, 485–486.) "In the heat of trial, defendant's counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. Except in rare cases an appellate court should not attempt to second-guess trial counsel." (*People v. Brooks* (1966) 64 Cal.2d 130, 140.) Counsel's testimony at the evidentiary hearing also indicated that she reasonably could have made the tactical decision to retain Juror No. 2 based on her disclosure during voir dire that she had a teenage stepdaughter at home who frequently lied, because that experience suggested that Juror No. 2 might be receptive to the defense theory that the teenage victims were lying about their molestation by Johnson. The "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.) Johnson has not "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (*Strickland*, *supra*, 466 U.S. at p. 689.)

Johnson also has not shown prejudice. "Voir dire is critical to assure that the Sixth Amendment right to a fair and impartial jury will be honored." (*People v. Chapman* (1993) 15 Cal.App.4th 136, 141.) "Unless the voir dire by a court is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner which voir dire is conducted is not a basis for reversal." (*Holt*, *supra*, 15 Cal.4th at p. 661.) Juror No. 2 testified that she set aside her prior experiences with rape, that she was fair and impartial, and that she decided Johnson was guilty based on the evidence introduced at trial and the court's instructions on the law. The superior court observed Juror No. 2's demeanor and testimony and found her credible. That finding is entitled to "great weight" and will not be disturbed where, as here, the record contains no evidence impugning her credibility. (*In re Wright* (1978) 78

1
2

Cal.App.3d 788, 801.)  Because the "allegedly inadequate voir dire [was] not shown to have resulted in the seating of a trial juror harboring [bias or] prejudice," Johnson has "fail[ed] to establish prejudice."  (*Holt*, at p. 704.)

3

4

(Lodgment No. 17, ECF No. 9-22 at 3–5.)

5

6

7

8

9

10

11

12

13

To establish ineffective assistance of counsel, a petitioner must first show his attorney's representation fell below an objective standard of reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id*. at 687.  He must also show he was prejudiced by counsel's errors.  *Id*. at 694.  Prejudice can be demonstrated by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*.; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993).

14

15

16

17

18

19

20

21

22

23

Further, *Strickland* requires "[j]udicial scrutiny of counsel's performance . . . be highly deferential."  *Strickland*, 466 U.S. at 689.  There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."  *Id*. at 686–87.  The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one.  *Id*. at 697.  "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citations omitted).  As the Supreme Court has stated, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id*.

24

25

26

27

28

Assuming counsel was deficient, Johnson has not established he was prejudiced because he has not shown "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  "Establishing *Strickland* prejudice in the context of juror selection requires a showing that, as a result of trial counsel's [error], the jury panel contained at

18-CV-1542 JLS (LL)

least one juror who was biased." *Davis v. Woodford*, 384 F.3d 628, 643 (9th Cir. 2004); *Fields*, 503 F.3d at 776 ("Prejudice exists if counsel fails to question a juror during voir dire or move to strike a juror and that juror is found to be biased . . . .")  As the state court correctly found, Johnson was has not established prejudice because, as this Court has concluded, *see* Section IV(B)(1), there is no evidence Juror No. 2 was actually or impliedly biased.

The state court's conclusion that Johnson had not established ineffective assistance of counsel was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Bell*, 535 U.S. at 694  Nor was it based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).  Johnson is not entitled to relief.

### E.  Ground Four:  Cumulative Error

Johnson argues the cumulative effect of the errors that occurred at his trial rendered his trial fundamentally unfair, in violation of his federal due process right to a fair trial. (Pet. at 9, 68–69.)  Johnson raised this claim in the petition for review he filed in the California Supreme Court on direct review, which the state supreme court summarily denied.  (Lodgment Nos. 9, 10, ECF Nos. 9-14, 9-15.)   Because the state appellate court did not decide this claim, however, this Court must conduct an independent review of the record to determine if the state court's denial of the claim was contrary to, or an unreasonable application of, clearly established Supreme Court law.  *Himes*, 336 F.3d at 853.

The Ninth Circuit has stated "[t]he Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)); *see also Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000); *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (stating that where no single trial error in isolation is sufficiently prejudicial to warrant habeas relief, "the cumulative effect of multiple errors may still prejudice a defendant").

Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." *Frederick*, 78 F.3d at 1381 (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)).  Cumulative error warrants habeas relief only where the combined effect of the errors had a "substantial and injurious effect or influence on the jury's verdict." *Parle*, 505 F.3d at 927 (quoting *Brecht*, 507 U.S. at 637).

This Court has found that none of the claims Johnson has presented amounted to constitutional error.  Because no errors occurred, no cumulative error is possible. *Hayes v. Ayers*, 632 F.3d 500, 523–24 (9th Cir. 2011) (stating that "[b]ecause we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible").  Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law, and Petitioner is not entitled to relief for his cumulative error claim. *Williams*, 529 U.S. at 412–13.

## V.   CERTIFICATE OF APPEALABILITY

Rule 11 of the Rules Following 28 U.S.C. § 2254 require the District Court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11, 28 U.S.C. foll. § 2254.  A certificate of appealability will issue when the petitioner makes a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253; *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005).  A "substantial showing" requires a demonstration that "'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Beaty v. Stewart*, 303 F.3d 975, 984 (9th Cir. 2002) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  Here, the Court concludes Johnson has not made the required showing, and therefore a certificate of appealability is not appropriate.

## VI.   CONCLUSION

After considering the Petition, the Answer and Memorandum of Points and Authorities in Support of the Answer, the Traverse, the lodgments and other documents

filed in this case, as well as the legal arguments presented by both parties, and for all the foregoing reasons, the Petition for a Writ of Habeas Corpus is **DENIED**.  The Court **DECLINES** to issue a certificate of appealability.  The Clerk of Court shall enter judgment accordingly.

      **IT IS SO ORDERED.**

Dated:  May 7, 2020

Hon. Janis L. Sammartino
United States District Judge

18-CV-1542 JLS (LL)